CONSERVATION LAW FOUNDATION,
et al., Plaintiffs–Appellants,

v.

FEDERAL HIGHWAY ADMIN-
ISTRATION, et al., Defen-
dants–Appellees.

No. 93–1976.

United States Court of Appeals,
First Circuit.

Heard Feb. 9, 1994.

Decided May 23, 1994.

Stephen H. Burrington with whom Conservation Law Foundation, Molly Cochran, Sullivan & Worcester, John Marks and J. William W. Harsch were on brief, for appellants.

Thomas F. Holt, Jr. with whom Laura Grant Schwartz, William C. Nystrom and Kirkpatrick & Lockhart were on brief, for appellees Dante E. Boffi, Jr., in his official capacity as Director of the Rhode Island Dept. of Transp., and the Rhode Island State Planning Council.

William B. Lazarus, Atty., Dept. of Justice, with whom Lois J. Schiffer, Acting Asst.

Atty. Gen., Edwin J. Gale, U.S. Atty., Michael P. Ionnotti, Asst. U.S. Atty., Mary Elizabeth Ward, Beverly Sherman Nash, and Jacques B. Gelin, Attys., Dept. of Justice, were on brief, for appellees Federal Highway Admin., Gordon G. Hoxie, in his official capacity as Div. Administrator for the Rhode Island Div. of the Federal Highway Admin., and Arthur E. Williams, in his official capacity as Chief of Engineers of the U.S. Army Corps of Engineers.

Daniel R. Barney, Lynda S. Mounts, Ata Litigation Center, Steven S. Rosenthal, Nancy F. Goodman, and Morrison & Foerster on brief for American Trucking Associations, Inc., amicus curiae.

Before TORRUELLA, CYR and BOUDIN, Circuit Judges.

TORRUELLA, Circuit Judge.

■ Plaintiffs in this case appeal the denial of their motion for a preliminary injunction. The district court denied the injunction on the ground that the plaintiffs failed to show a likelihood of success on the merits of their underlying claims. *See Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 5 (1st Cir.1991). We review the district court's denial of the preliminary injunction " 'under a relatively deferential glass,' " and will disturb such a ruling only if we find the court made a manifest mistake of law or abused its discretion. *Id.* (quoting *Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co.*, 864 F.2d 927, 929 (1st Cir.1988)).

After reviewing the record in this case and the arguments in the briefs, we conclude that the district court did not abuse its discretion or make any manifest errors of law when it found that plaintiffs had failed to establish a likelihood of success on the merits of their claims under the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4347; Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. § 1344(a); Section 4(f) of the Department of Transportation Act ("DOTA"), 49 U.S.C. § 303(c); and Section 176 of the Clean Air Act ("CAA"), 42 U.S.C. § 7506(c). We therefore affirm the district court's denial of plaintiffs' motion for a preliminary injunction.

Because the district court's opinion presents a thorough and accurate discussion of the facts of this case, we find it appropriate to incorporate that discussion into our decision.

## I. Introduction

This litigation stems from the proposed construction of the Jamestown Connector, a four-lane, divided, controlled access highway across the island of Jamestown, Rhode Island which will connect the Jamestown–Verrazzano Bridge and the Pell (Newport) Bridge. Jamestown Island, lies in the middle of Narragansett Bay in what is known by some as the Route 138 corridor, a forty (40) mile stretch of roadways running from I–95 in Richmond, Rhode Island to I–195 in Swansea, Massachusetts. The plaintiffs are the Conservation Law Foundation ("CLF"), Audubon Society of Rhode Island, Clean Water Action, Concerned Island Residents, DOT Watch, Environmental Council of Rhode Island, Save the Bay, Sierra Club, South Kingstown Neighborhood Congress, and West Side Association. Plaintiffs filed two separate actions, which have been consolidated, seeking to enjoin construction of the Jamestown Connector. The defendants are the Federal Highway Administration ("FHWA"), Gordon G. Hoxie in his official capacity as Division Administrator for the Rhode Island Division of the Federal Highway Administration, Arthur E. Williams in his official capacity as Chief of Engineers of the U.S. Army Corps of Engineers ("the Corps"), Dante E. Boffi, Jr. in his official capacity as Director of the Rhode Island Department of Transportation ("RIDOT"), and the State Planning Council. In total, plaintiffs allege violations of five federal statutes: the National Environmental Policy Act ("NEPA"), the Intermodal Surface Transportation Efficiency Act ("ISTEA"), the Clean Water Act ("CWA"), the Department of Transportation Act ("DOT"), and the Clean Air Act ("CAA").

## II. Factual Background

The history of this highway project dates back to proposed Interstate High-

way 895 ("I–895"), which received original approval in December 1969 as part of the Interstate and Defense Highway System. The original proposed 12.1 mile route spanned Narragansett Bay between Warwick and Barrington, Rhode Island. In 1974, FHWA approved a RIDOT proposal which recommended a substitute route. The proposed substitute I–895 essentially tracked Route 138, an undivided roadway dating from the early 1920's, from I–95 in Richmond, Rhode Island to I–195 in either Swansea or Fall River, Massachusetts. Route 138 is the only road crossing Narragansett Bay south of Providence, Rhode Island.

In November 1975, RIDOT initiated an Environmental Impact Statement/Corridor Location Study for designated I–895. In April 1979, RIDOT published the I–895 Draft Environmental Impact Statement ("DEIS"). The 1979 DEIS recognized that Route 138 "was not intended to accommodate the types of vehicles, prevailing operating speeds, and the volumes of traffic" that it then carried. Following the publication of the DEIS, community comment was received at four public hearings. On February 5, 1982, the State of Rhode Island requested withdrawal of proposed I–895 from the Interstate Highway System. On December 30, 1982, FHWA approved Rhode Island's withdrawal request because I–895 was not "essential to the completion of a unified and connected Interstate System." (Fed.Def.Exh. 6) Much of the proposed I–895 corridor, however, remained eligible for federal funds for substitute projects.

The 1979 DEIS contained a separate section addressing the construction of a Jamestown Bridge replacement structure. Because of its functional obsolescence, increases in traffic volumes, skyrocketing maintenance costs and the need for a completely new concrete deck, RIDOT determined that the existing two-lane Jamestown Bridge needed replacement. The Surface Transportation Act of 1978 specifically allocated discretionary funding under the Highway Bridge Replacement Program to implement the Jamestown Bridge replacement project. As a result, FHWA authorized the development of a site-specific Jamestown Bridge Environmental Impact Statement ("JBEIS"). The JBEIS, completed in May 1989, proposed a four-lane replacement bridge adjacent to the existing bridge and four-lane access roadways extending from Route 1A in North Kingstown to Helm Street on Jamestown.

Following the decision to withdraw I–895, RIDOT continued to examine the need for improvements throughout the Route 138 Corridor. RIDOT's analysis culminated in 1984 with the issuance of a Final Environmental Impact Statement ("FEIS") for the corridor. FHWA approved the FEIS on September 27, 1984. The 1984 FEIS study area encompassed Washington, Newport, and Bristol Counties in Rhode Island, as well as Swansea, Massachusetts. In Washington County, the FEIS proposed a mixture of upgrades to certain existing portions of Route 138, a no-build option for other portions of Route 138, and construction of new roadways in other areas of the corridor. On Jamestown Island, the FEIS proposed a four-lane reconstruction along the available right of way on Eldred Avenue (1.1 miles) and two possible four-lane alternatives for East Shore Road (1.1 miles). The FEIS recognized that the Jamestown Design Study Committee ("JDSC"), which had been formed in February of 1983, was considering the entire connector roadway system for Jamestown Island. Accordingly, the FEIS contemplated draft and final supplemental EIS documents for the project following decisions by JDSC and RIDOT. On Aquidneck Island, the 1984 FEIS recognized the need for improvements but proposed a no-build alternative and recommended further studies. Finally, the FEIS proposed a no-build option for the East Shore portion of the study area including Bristol County, Rhode Island and Swansea, Massachusetts.

Following the 1984 FEIS, the JDSC convened numerous public meetings on Jamestown and collected community reaction to the proposed cross-island roadway. Based upon community input, the JDSC recommended a conceptual plan to RIDOT

in June 1984 which, with certain refinements, became known as Alternative B. Alternative B proposed a controlled access four-lane roadway extending from the Jamestown–Verrazzano Bridge along Eldred Avenue with interchanges at Helm Street and North Road and flowing into a new four-lane roadway located west of East Shore Road extending to the Newport Bridge.

Based on the JDSC's recommendations, RIDOT completed a draft supplemental environmental impact statement ("DSEIS") in April 1986. The FHWA approved the DSEIS on April 22, 1986. The DSEIS considered six alternatives for a cross-island roadway on Jamestown: a No–Build Alternative, the Transportation Systems Management ("TSM") Alternative, two unlimited access roadways (Alternatives A and A1), and two limited access roadways (Alternatives B and C). The DSEIS identified Alternative B, now known as the "Jamestown Connector", as the preferred alternative. RIDOT circulated the DSEIS on May 23, 1986 and held a public hearing at the Jamestown Elementary School on June 26, 1986.

Following the submission of the DSEIS, RIDOT began pursuing necessary permits for Alternative B from the Rhode Island Department of Environmental Management ("RIDEM"). Pursuant to provisions of the Administrative Procedure Act and Rhode Island's Freshwater Wetlands Act, a wetland public hearing was held on February 10, 1987 to resolve issues pertaining to wetland impacts and Alternative B. Following the hearing, RIDOT and RIDEM signed a consent agreement which modified Alternative B to minimize wetlands impact. The RIDEM Wetlands Public Hearing Officer incorporated the conditions of the consent agreement into the final design and order rendered on April 30, 1987. The order specified conditional permit approval to alter freshwater wetlands.

RIDOT completed a final supplemental environmental impact statement ("FSEIS") for the Jamestown Connector in July 1987 and FHWA approved the FSEIS on December 18, 1987. The FSEIS responded to comments received on the 1986 DSEIS and investigated the same six design alternatives, with some modifications, considered by the 1986 DSEIS. According to the FSEIS, traffic safety and drainage concerns rendered the No–Build Alternative and the TSM Alternative not viable. The unlimited access upgrade alternatives, A and A1, failed to separate local and through traffic, failed to maintain highway continuity, permitted continued development along the alignment frontage, and allowed for high traffic volumes, congestion and increasing accident rates. Alternative C affected the greatest acreage in the Windmill Hill Historic District and failed to attract support from Jamestown residents because of undesirable local access designs. Alternative B, meanwhile, provided the greatest benefits while minimizing adverse impacts to the residents and surrounding environment according to the FSEIS. As a result, the FSEIS identified Alternative B as the preferred alternative. On May 27, 1988, FHWA issued a Record of Decision ("ROD") on the FSEIS which expressly ratified the selection of Alternative B for further project development.

The 1987 FSEIS also found Alternative B to be consistent with six other planned and committed highway projects within the Route 138 Corridor: the I–95 to Route 2 upgrade; the relocation of Route 138 from Route 2 to U.S. 1; the reconstruction of Route 138 from U.S. 1 to the Jamestown Bridge; the Jamestown Bridge Replacement; the Newport Circulator Project; and the Route 138 upgrading along East Main Road from Route 24 to Route 113. The cumulative impacts of the projects located in Washington County and Jamestown (all projects except the Newport Circulator and the East Main Road upgrade) had been previously analyzed in the corridor-wide 1979 DEIS and 1984 FEIS.

RIDOT proposed reconstruction of the two-lane roadway from I–95 to Route 2 in three phases. Phase one was completed in 1981 and the other two phases are in the preliminary design stage. RIDOT reevaluated the FEIS for the relocation of Route

138 from Route 2 to U.S. 1 in February 1991 and modified the original alignment. The roadway from Route 1 to the Jamestown Bridge, approved in the 1981 JBEIS, was constructed during 1992. The new Jamestown–Verrazzano Bridge replaced the Jamestown Bridge and opened to traffic on October 19, 1992. The Newport Circulator Project has been replaced by a series of lesser improvements expected to be forwarded with a request for a Finding of No Significant Impact ("FONSI") in Summer 1993. Finally, the FHWA approved improvements to the four-lane East Main Road on December 24, 1991 and selection of a consultant to begin final design is underway.

The 1987 FSEIS also examined impacts to parklands and historic resources governed by Section 4(f) of the Department of Transportation Act ("DOT") and Section 106 of the National Historic Preservation Act. This evaluation focuses on the Windmill Hill Historic District and examined four build alternatives, a No–Build Alternative, and an Avoidance Alternative. Although the No–Build Alternative would not impinge upon historic resources, it failed to meet the project goals and was determined to be neither prudent nor feasible. All four of the build alternatives adversely effected the Windmill Hill Historic District. The FSEIS determined that Alternatives A and A1, both four-lane uncontrolled access roadways with at grade intersections, carried far less short-term impacts on historic resources than the preferred alternative. These alternatives, however, failed to meet traffic service and safety concerns and permitted the possibility of future development which could have a far greater long-term impact on the historic district. The FSEIS determined that Alternative C, a limited access highway on a different alignment, required the use of more historic resources than Alternative B without providing offsetting traffic or safety benefits. Finally, although an Avoidance Alternative, designed to avoid all protected Section 4(f) resources on Jamestown Island, was feasible, the FSEIS determined that it was not prudent because of "a number of disruptive consequences involved in this or any alternative that avoids the Windmill Hill Historic District." Although it found that Alternative A1 caused the least impact to the historic district, the Rhode Island Historical Preservation Commission recognized that the separation of through and local traffic achieved with Alternative B necessitated considering this alternative even though it had greater short-term Section 4(f) impacts. The 1987 FSEIS ROD concluded that there was no prudent or feasible alternative to the use of land from the Windmill Hill Historic District and Alternative B included all possible planning to minimize harm resulting from such use.

On June 8, 1988, FHWA authorized the acquisition of parcels to establish a right-of-way along Eldred Avenue from Seaside Drive to North Road. By November 7, 1990, RIDOT had acquired at least 143 of the 202 parcels necessary to build the Jamestown Connector.

In October, 1986 RIDOT submitted to the Corps the first of a series of applications for a permit for the filling of wetlands in connection with the Jamestown Connector. (Plaintiffs' Exh. 22 and 23.) Although the Corps issued a public notice regarding its permit review for the Jamestown Connector on November 29, 1990, no public hearing was held in connection with the permit application. On May 22, 1992, the Corps completed an Environmental Assessment ("EA") and statement of findings for the purposes of issuing a Section 404 permit to fill wetlands. The EA "considered all factors relevant to th[e] proposal including cumulative effects." The environmental assessment minimized wetlands impacts by replacing the Helm Street overpass with a frontage road to address local access concerns. Based on the evaluation of environmental effects discussed in the 1987 FSEIS, the Corps determined that the "decision on [the Section 404] application [was] not a major federal action significantly affecting the quality of the human environment" and therefore required no separate environmental impact statement. The Corps concluded that Alternative B without the Helm Street overpass was the least environmentally damag-

ing practicable alternative. As a result, on May 21, 1992, the Corps issued a final Section 404 permit authorizing RIDOT to fill approximately 4.6 acres of wetlands to construct the Jamestown Connector.

Throughout and following the Corps permit approval process, the JDSC continued to hold periodic meetings to evaluate additional proposed refinements to the Jamestown Connector design. In a JDSC meeting held on May 7, 1992, Thomas Todd, an architect and Jamestown resident, presented an alternative design featuring an at-grade, signalized intersection at the crossing of Eldred Avenue and North Road. Mr. Todd's conceptual layout included two travel lanes in each direction and separate left and right turn lanes along Eldred Avenue. Minutes of the meeting reflect that Mr. Todd also had contacted the Jamestown Police and had been informed that there had been 213 accidents (78 involving injury) on Route 138 in Jamestown over the previous five year period. Records at the Newport Bridge Toll Plaza indicated that approximately 31 million trips had been made over that same time period. At the same meeting, the JDSC formed an architectural review committee, with Mr. Todd as a member. Over the next six months, RIDOT incorporated certain profile and architectural adjustments suggested by the architectural review committee into the Jamestown Connector design.

FHWA conditionally approved the receipt of bids for the Jamestown Connector on July 31, 1992. Plaintiffs commenced this action on October 8, 1992. RIDOT opened bids for the Jamestown Connector on December 11, 1992. On April 21, 1993, RIDOT issued a conditional notice to proceed with construction activity to its contractor, Tilcon Gammino. After final notice to proceed was given, construction began on May 13, 1993. On May 21, 1993, plaintiffs moved for a temporary restraining order ("TRO") to enjoin further construction. On May 25, 1993, this court granted plaintiffs' TRO application which restrained further construction activity within the frontage road area along Eldred Avenue. The court vacated the TRO on June 8, 1993. Defendants have moved to

dismiss plaintiffs' Clean Air Act claim for lack of jurisdiction and failure to state a claim upon which relief can be granted. Plaintiffs, in turn, have moved for summary judgment on their Clean Air Act and Intermodal Surface Transportation Efficiency Act claims. Because these motions raise substantially the same issues as plaintiffs' application for preliminary injunction, the court defers ruling on them and considers all claims under the preliminary injunction standard.

*Conservation Law Found. v. Federal Highway Admin.*, 827 F.Supp. 871, 872–77 (D.R.I. 1993) (footnotes omitted).

## I. DISCUSSION

■ Plaintiffs challenge the district court's findings under NEPA, § 404 of CWA, § 4(f) of DOTA, and the CAA. *Conservation Law Found.*, 827 F.Supp. at 877–91. We bear in mind that the district court reviewed the actions of several administrative agencies throughout much of its opinion. The actions of such agencies shall not be overturned unless "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In particular, the administrative actions taken in this case under NEPA, § 404 of CWA, § 4(f) of DOTA and § 176 of the CAA are subject to a highly deferential abuse of discretion standard of review. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377–78 & n. 23, 109 S.Ct. 1851, 1861–62 & n. 23, 104 L.Ed.2d 377 (1989) (NEPA); *Sierra Club v. Marsh*, 976 F.2d 763, 769 (1st Cir.1992) (NEPA); *Norfolk v. United States Army Corps of Eng'rs*, 968 F.2d 1438, 1445–46 (1st Cir.1992) (§ 404 of the CWA); *Communities, Inc. v. Busey*, 956 F.2d 619, 623–24 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 408, 121 L.Ed.2d 332 (1992) (§ 4(f) of the DOTA) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)); *Sierra Club v. Larson*, 2 F.3d 462, 466–69 (1st Cir.1993) (substantial deference given to EPA's interpretation of the CAA); *Puerto Rican Cement Co. v. United States EPA*, 889 F.2d 292, 296–98 (1st Cir.1989) (EPA's construction of the CAA given "controlling weight" unless it is

"plainly erroneous"). For the following reasons, we uphold the district court's findings in this case.

## A. *NEPA CLAIMS*

### 1. Logical Termini

The district court found that none of the defendants violated its respective obligations under NEPA to prepare proper Environmental Impact Statements ("EISs") for the Jamestown Connector highway project. In particular, the court rejected plaintiffs' argument that the defendants unlawfully segmented the geographic area of analysis in the 1987 Jamestown Connector EIS ("Jamestown FSEIS") and that defendants failed to consider the cumulative impacts of highway projects all along the Route 138 Corridor.

Federal Highway Administration ("FHWA") regulations provide that an EIS is of proper geographic scope if the project it analyzes connects "logical termini," has "independent utility" and does not restrict "consideration of alternatives." 23 C.F.R. § 771.111(f). The district court found that the Jamestown Connector project satisfied all three criteria and, as a result, the 1987 Jamestown FSEIS was of the appropriate scope. The plaintiffs take issue only with the court's determination of the first prong (the so-called "logical termini" prong).

"Termini" include crossroads, population centers, major traffic generators, or similar highway control elements. 37 Fed.Reg. 21,810. The district court found that the two bridges on each side of the Jamestown Connector (entering and exiting Jamestown island) are logical enough termini to uphold the agencies' determination that the connector was a proper geographic area for environmental analysis. In particular, the court accepted defendants' argument that the bridges are traffic generators or traffic control devices.

Plaintiffs contend that the bridges do not qualify as "crossroads" or "traffic generators," but instead are merely indistinguishable strips of the highway that happen to pass over water. According to the plaintiffs, because most traffic merely passes over the bridges and through the island on its way to and from cities in Connecticut and Massachusetts, and to and from various highway interchanges that are located several miles away from the bridges, the bridges themselves neither control nor generate any traffic but merely carry it. Thus, the bridges are allegedly not a "beginning or end" such that they could reasonably be considered "termini."

■ Plaintiffs present a strong argument, but, given that we are reviewing this case for an abuse of discretion, we cannot find that the district court erred in upholding the agencies' determination of termini. *See Swain v. Brinegar,* 542 F.2d 364, 369 (7th Cir.1976) ("The task of the court is not to decide where to draw the line, but to review the matter to ascertain whether the agency has made a reasonable choice."). The bridges may not "control" or "generate" traffic in the strict sense of those words, but they do represent the only way that cars can get onto and off of the island. Thus, traffic passing through southern Rhode Island is controlled by the existence and condition of those bridges. Although the FHWA is not free to consider every bridge or culvert in a highway system to be a suitable end point for purposes of conducting EIS analysis, two bridges over Narragansett Bay, a considerably large body of water, can reasonably constitute a major "highway control element." 37 Fed.Reg. 21,810. Ultimately, when viewed through the lens of basic common sense, two bridges on either side of an island appear to be perfectly logical termini to us.

None of the authorities cited by the plaintiffs indicates that "logical termini" must be located at interchanges or major metropolitan areas. We do not believe that those decisions which found indistinguishable strips of highway to be improper termini for EIS purposes apply to the present case. *See Swain* 542 F.2d at 369–70; *Indian Lookout Alliance v. Volpe,* 484 F.2d 11, 19–20 (8th Cir.1973); *Patterson v. Exon,* 415 F.Supp. 1276, 1283 (D.Neb.1976). We also do not find any authority for plaintiffs' assertion that the district court erred as a matter of law by considering the geographic situation of Jamestown Island in its determination that the bridges are logical termini. *Indian*

*Lookout Alliance,* 484 F.2d at 18–19, for example, says nothing about the propriety or impropriety of considering special geographic features in making logical termini analysis. Rather, the case simply states that courts should look to the nature and purpose of the project in determining which termini are logical. *Id.* In this case, one of the purposes of the Jamestown Connector is to facilitate traffic passing from one side of the island to the other. From this perspective, the bridges are logical endpoints.

■ The district court also considered the two other elements in 23 C.F.R. § 771.111(f) ("independent utility" and "reasonable alternatives") when it found that the Jamestown FSEIS was of the proper scope. The court found that these two factors carry more weight in this case than the "logical termini" prong. Plaintiffs argue that this finding is error because courts can only accord "logical termini" less importance where the highway project is in a major metropolitan area. The relevant cases concerning the reduced weight afforded to the "logical termini" prong do involve highway projects in metropolitan areas. *See, e.g., Coalition on Sensible Transp. Inc., v. Dole,* 826 F.2d 60, 69 (D.C.Cir.1987); *Piedmont Heights Civic Club, Inc. v. Moreland,* 637 F.2d 430, 440 (5th Cir.1981). The courts in those cases, however, did not reduce the weight afforded to the termini prong simply because the area in question was urban as opposed to rural. Rather, the courts reduced the importance of the termini factor in those cases because it was difficult to determine where projects began and ended in convoluted urban highway systems. *Coalition on Sensible Transp.,* 826 F.2d at 69; *Piedmont Heights,* 637 F.2d at 440. Therefore, the district court did not err in stating that, as a matter of law, the "indepen-dent utility" and "reasonable alternative" prongs are more important "where logical termini are not so easily determined." *Conservation Law Found.,* 827 F.Supp. at 879. Although the Jamestown Connector does not involve the usual spaghetti of highway interchanges often found in urban centers, it does involve sufficient special circumstances—the traversing of an island in the middle of Narragansett Bay—to warrant a finding that "logical termini are not so easily determined."

### 2. Cumulative Impact

■ The plaintiffs next contend that the district court erred in finding that the Jamestown FSEIS properly considered the cumulative effects on the environment of all projects along the entire Route 138 corridor as required by NEPA and the regulations promulgated by the Council on Environmental Quality ("CEQ"). 40 C.F.R. §§ 1508.7 & 1508.25(a). The district court stated that the Jamestown FSEIS "concluded that the Jamestown Connector was consistent with six other planned and committed projects in the Route 138 Corridor." Recognizing that this was not, in itself, a complete cumulative analysis, the court then added that the Jamestown FSEIS also referenced the FHWA's 1984 Route 138 EIS ("1984 FEIS") and the original I–895 draft EIS ("1979 DEIS") which did conduct a sufficient cumulative impact analysis.[1] The district court noted that the 1979 DEIS considered the effects of the entire Route 138 corridor and that the 1984 FEIS analyzed projects in Washington County and Jamestown, including the "general location and mode choice for what would become the Jamestown Connec-

---

1. Plaintiffs take issue with the district court's use of a quote, *Conservation Law Found.,* 827 F.Supp. at 880, from *Fritiofson v. Alexander,* 772 F.2d 1225 (5th Cir.1985), stating that a "full-blown environmental analysis of the impacts of other actions" is not required. Although the plaintiffs are correct that this quote refers to a preliminary Environmental Assessment and not to a more in-depth EIS, the quote does interpret the very same regulations applied in this case. In any event, the quote is not a crucial part of the district court opinion because the court goes on to explain why the EISs do in fact contain a full cumulative effects analysis. Similarly, the following sentence on page 880, referring to a satisfaction of "statutory minima" under *Piedmont Heights,* 637 F.2d at 441, although pertaining to the NEPA statute in general instead of the specific CEQ regulations at issue here, is still applicable to this case because it addresses the basic question of what information can be used by agencies to analyze cumulative effects of various projects. We think it is reasonable, and plaintiffs present no caselaw to the contrary, for agencies to consider prior studies, draft or otherwise, in their EISs and to include them by reference.

tor." *Conservation Law Found.*, 827 F.Supp. at 881.

■ Plaintiffs first of all contest the court's conclusion that the 1984 FEIS and the 1979 DEIS conducted the necessary cumulative analysis. They do not take issue with the substance of the analysis in these reports or with the thoroughness of the environmental review conducted by the defendants. Instead, plaintiffs challenge the geographic scope of the area considered in those reports, arguing that because parts of the Route 138 corridor were left out of the various EISs, their analyses cannot be completely cumulative. They claim that the 1984 FEIS did not analyze proposed actions for the Route 138 corridor east of Washington County (which is basically the Newport Rhode Island area where the highway continues east of Jamestown Island after crossing the eastern bridge off the island). While the 1979 DEIS did analyze this area, it did not consider the exact same highway routes and projects that are presently contemplated for the area (*i.e.*, the original projects for that area have since been discarded). Consequently, plaintiffs point out that neither EIS analyzed two of the six projects listed within the Jamestown FSEIS as part of the Route 138 corridor (the Newport Circulator and East Main Road upgrade).[2]

For us, the bottom line is that the relevant agencies conducted an analysis of the environmental impact of highway construction projects along Route 138. The 1979 and 1984 EISs contain in-depth discussions (300 pages worth in the 1979 DEIS and 200 pages in the 1984 FEIS) covering a wide range of environmental concerns surrounding highway construction in the area of Route 138. For its part, the Jamestown FSEIS explicitly referenced the two prior EISs and placed the

Jamestown connector in the context of the entire Route 138 corridor project. The 1979 and 1984 EISs may not have covered precisely the same geographical areas or projects that are now being built or proposed in conjunction with the Jamestown Connector, but they did sufficiently consider the incremental impact of individual sections of Route 138 construction "when added to other past, present and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. We therefore do not believe the district court abused its discretion in rejecting the plaintiffs' contention that the aforementioned discrepancies in the EISs violated NEPA.

Plaintiffs nevertheless maintain that even if the combined analyses contained in all the EISs constitute proper cumulative impact review, the process of referencing them in the Jamestown FSEIS does not comport with the cumulative impact requirements in the CEQ regulations. According to the plaintiffs, a particular EIS cannot incorporate the findings of other EISs unless it is part of a proper "tiering" process as provided for in 23 C.F.R. § 771.111(g). Under § 777.111(g):

> For major transportation actions, the tiering of EISs as discussed in the CEQ regulation (40 C.F.R. § 1502.20) may be appropriate. The first tier EIS would focus on broad issues.... The second tier would address site-specific details....

The district court found the "tiering" of the Jamestown FSEIS on top of the 1984 FEIS and 1979 DEIS to be proper in this case.

Plaintiffs claim this finding is erroneous because: (1) the 1979 DEIS was just a draft having no legal effect; (2) the 1984 FEIS did not qualify as a programmatic evaluation upon which smaller projects could be tiered; and (3) the Route 138 Corridor is not a

**2.** Plaintiffs also claim that the 1984 FEIS "deferred analysis of the Jamestown Connector," by noting several times that the process for deciding on the construction design and route for the Jamestown Connector was ongoing and that no decision had been made. Therefore, plaintiffs argue, the 1984 FEIS did not properly consider the cumulative impact of all projects taken together in its environmental analysis. This argument strikes us as a red herring. The 1984 FEIS clearly contemplated some kind of highway construction between the two bridges on Jamestown

Island and it explicitly discussed the fact that a more in-depth environmental study of the island would be done in a supplemental EIS. A full description of the environment on Jamestown island was included in the 1984 FEIS. The Jamestown FSEIS was subsequently written as a supplement to the 1984 FEIS and both EISs contemplated that the two would be read together. The district court found this to be sufficient to satisfy the cumulative impact analysis requirement and we see no abuse of discretion in this ruling.

sufficiently large, wide-ranging federal project for which tiering is appropriate.

■ Although the plaintiffs are correct that the 1979 DEIS has no legal effect and cannot, by itself, serve as the first tier in the EIS process, nothing that the plaintiffs point to precludes a final EIS from referring to the reports and data contained in a draft EIS to analyze cumulative impacts of governmental actions. Thus, the information in the 1979 DEIS can be considered a part of the cumulative impact analysis for Route 138.

The plaintiffs further argue that the 1984 FEIS was not sufficiently comprehensive to constitute a programmatic first tier that can support the second tier in the Jamestown FSEIS. To support this contention, plaintiffs basically restate their earlier argument that the 1984 FEIS failed to analyze all the proposed projects along the entire Route 138 corridor. To briefly restate our rejection of this argument, the 1984 FEIS not only addressed the Route 138 corridor in a comprehensive fashion, it explicitly contemplated that a supplemental EIS, the Jamestown FSEIS, would be prepared in ·conjunction with the larger EIS. We see no abuse of discretion in finding this to be a proper application of the tiering regulations. Cases relied on by the plaintiff to support its contention that the 1984 FEIS is incomplete, *Kleppe v. Sierra Club*, 427 U.S. 390, 410, 96 S.Ct. 2718, 2730, 49 L.Ed.2d 576 (1976); *National Wildlife Fed. v. Appalachian Reg. Comm'n*, 677 F.2d 883, 888 (D.C.Cir.1981), discuss when a single, programmatic EIS is required, but they do not dictate the precise manner and content of those programmatic EISs. In this case, it is reasonable to conclude that the 1984 EIS considered together the combined consequences of proposed actions along Route 138. *See Appalachian Reg. Comm'n*, 677 F.2d at 888.

Finally, plaintiffs claim that the Route 138 Corridor cannot be tiered because it does not qualify as a "major transportation action." Because plaintiffs point to no case authority for imposing a "major transportation action" requirement in the tiering context, we find this assertion to be unfounded. Plaintiffs cite cases involving "wide ranging federal projects" for which broad "programmatic"

EISs have been prepared. *See Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (development of a national coal leasing program); *Tenakee Springs v. Block*, 778 F.2d 1402 (9th Cir.1985) (land use plans for the Tongass National Forest); *National Wildlife Fed. v. Appalachian Reg. Comm'n*, 677 F.2d 883 (D.C.Cir.1981) (the 13–state Appalachian Highway System). None of these cases say anything about the requirements for tiering, nor do they say anything to indicate that a highway project, like Route 138, cannot qualify as a "major transportation action" or even a "wide ranging federal project." Consequently, plaintiffs provide no basis for us to find a manifest error of law with respect to the district court's tiering ruling.

■ Even if NEPA did require that a first tier EIS must cover a "major transportation action," Route 138 appears to qualify. Plaintiffs describe the Route 138 project as merely a "40–mile state highway that is being upgraded with the help of federal funds." Even if this characterization is accurate, the district court did not abuse its discretion in finding forty miles of highway crossing Narragansett Bay and passing through several different islands to be a "major transportation action."

### 3. Actions of the Army Corps of Engineers

■ Under § 404 of the CWA, the Army Corps of Engineers (the "Corps") must prepare an EIS in compliance with NEPA if there is a "substantial possibility" that the proposed actions (in this case, the granting of a permit to fill wetlands) could "significantly affect" the environment. For the Jamestown Connector, the Corps prepared a preliminary Environmental Assessment ("EA") and found no significant impact warranting a full EIS. While the record does contain evidence that the project will detrimentally affect some wetlands, this evidence does not overwhelmingly contradict the Corps' conclusion that the project will not "significantly affect" the environment. The district court upheld the Corps' determination and we find no abuse of discretion on the part of the court or the Corps.

The district court also found that the Corps did not improperly segment their analysis in the EA or fail to consider cumulative effects. Plaintiffs claim error but the district court responded fully to their objections. *Conservation Law Found.*, 827 F.Supp. at 881. We have nothing to add.[3]

## B. *CLEAN WATER ACT & DEPT. OF TRANSPORTATION ACT CLAIMS*

Under § 404 of the Clean Water Act, the Corps cannot issue a permit to fill wetlands if there exists a "practicable alternative"[4] to the proposed action that would have less adverse impact. Likewise, the FHWA may not approve a transportation project under § 4(f) of the Department of Transportation Act which encroaches on a National Historic Site unless no "prudent and feasible" alternative exists.

Plaintiffs claim that the district court erred in crediting the determination of the Corps and the FHWA that there were no practicable alternative designs to the Jamestown Connector project. Specifically, plaintiffs argue that the agencies failed to consider the so-called "Todd design" which is identical to the design actually chosen (the FHWA and the Corps chose "Alternative B") except that a stoplight and an at-grade intersection would replace a proposed overpass at one of the major intersections on the island.

Although the defendants did not explicitly consider the Todd design itself, the district court found that the Corps and the FHWA did consider the main feature of the Todd design—the at-grade intersection in place of the overpass—when they evaluated two other alternatives (Alternatives A and A1). Plaintiffs object to this because Alternatives A and A1 involve an unlimited access road and other features not present in the Todd design. Therefore, plaintiffs contend, the conclusion by the defendant agencies that Alter-

natives A and A1 are not practicable because they involve significant traffic congestion and safety hazards does not necessarily apply to an alternative that removes all the traffic hazards with the exception of one stoplight at a major intersection.

This is a valid objection, but plaintiffs' contention does not justify a finding of an abuse of discretion or manifest error of law. Technical discrepancies may have existed between alternatives actually considered and an alternative which, if considered, may have been found to be more practicable. The two alternatives considered, however, were somewhat similar in that they both contained an element of major concern to the Corps—an at-grade intersection which could lead to traffic congestion and safety problems. This similarity is sufficient to render the Corps' substantive analysis acceptable.

Plaintiffs also argue that because two other agencies, the Environmental Protection Agency ("EPA") and the U.S. Fish and Wildlife Service ("FWS"), criticized the FHWA's conclusions in the 1987 FSEIS, the Corps could not "blindly rely" on the FHWA's conclusion that Alternative B was the least environmentally damaging practicable alternative. As the district court points out, however, the Corps did not "blindly rely" on the 1987 FSEIS. Rather, the Corps supplemented the FHWA's evaluation with its own administrative record, studies, and responses to public comment. The district court's finding is not an abuse of discretion.

▮▮▮ Finally, § 4(f) of the DOT requires that the FHWA must undertake all possible planning to minimize harm to historical sites. Plaintiffs argue that the Todd design alternative constitutes an example of required planning which would minimize such harm. Under § 4(f), agency determinations that a particular plan minimizes harm to historical sites deserve even greater deference than agency

---

3. The plaintiffs cite *Fritiofson v. Alexander*, 772 F.2d at 1244, for the proposition that "conclusory statements" by the Corps that it has considered cumulative impacts are insufficient to show compliance with the cumulative impact requirements. We do not read this case as standing for such a proposition or in any way casting serious doubt on the validity of the district court's holding.

4. 40 C.F.R. § 230.10(a)(2) provides that:

An alternative is practicable if it is available and capable of being done, after taking into consideration cost, existing technology, and logistics in light of overall project purposes.

determinations concerning practicable alternatives. *Coalition on Sensible Transp. Inc. v. Dole,* 642 F.Supp. 573, 599 (D.D.C.1986); *see also Druid Hills Civic Ass'n. v. Federal Highway Admin.,* 772 F.2d 700, 716 (11th Cir.1985). With this in mind, our review of the record convinces us that the district court's discussion of the "planning to minimize harm" issue, *Conservation Law Found.,* 827 F.Supp. at 883–84, is beyond reproach on appellate review.

## C. *CLEAN AIR ACT CLAIMS*

### 1. Jurisdiction

We address, first of all, the *defendants'* argument that the federal court has no jurisdiction over plaintiffs' Clean Air Act ("CAA") claims—an issue not addressed by the district court but one that we nevertheless may notice on appeal. *Sierra Club v. Larson,* 2 F.3d 462, 465–66 & n. 3 (1st Cir.1993); *Martel v. Stafford,* 992 F.2d 1244, 1245 (1st Cir. 1993). The defendants claim that the language of the citizen suit provision of the Clean Air Act, 42 U.S.C. § 7604(a)(1), which authorizes suits to enforce violations of an "emission standard or limitation," limits such suits to cases involving standards and limitations set in a state implementation plan or standards set by the EPA. Because the present suit does not involve the enforcement of standards set out in a state or EPA plan, defendants argue that the district court had no jurisdiction to consider the plaintiffs' claims in the first place. We disagree.

Under CAA's citizen suit provision, any person may commence a civil action to enforce violations of an "emission standard or limitation under this chapter." 42 U.S.C. § 7604(a)(1). The term "emission standard or limitation" is defined by 42 U.S.C. § 7604(f) as a "standard of performance ... which is in effect *under this chapter ... or* under an applicable implementation plan." [5] (emphasis added). According to its plain language, this section includes "standards of performance" set out in the Act itself. The specific statutory provisions enumerated in § 7604(f)(3) are not the only statutory provi-

sions that can be enforced under the citizen suit provision. Rather, as long as the claimed violation involves a "standard of performance" "under" the CAA, the court has jurisdiction pursuant to § 7604(f)(1), even though the standard is not imposed by the statutory sections enumerated in § 7604(f)(3).

■ In this case, plaintiffs are challenging the defendants' violation of the CAA conformity requirements, 42 U.S.C. § 7506(c)(1) & (c)(3), which mandate that defendants demonstrate that their transportation projects "would contribute to annual emissions reductions consistent with" the levels set out in § 7511a(b)(1) and § 7512a(a)(7). These conformity requirements plainly constitute an emissions "standard of performance" as that term is defined in 42 U.S.C. § 7602(*l*) ("a requirement of continuous emission reduction, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction"). Therefore, because the citizen suit provision allows for suits to enforce "standards of performance," 42 U.S.C. § 7604(f)(1), this court has jurisdiction over plaintiffs' CAA claims. *See Delaney v. EPA,* 898 F.2d 687, 693 (9th Cir.), *cert. denied,* 498 U.S. 998, 111 S.Ct. 556, 112 L.Ed.2d 563 (1990) (enforcing 42 U.S.C. § 7506(c) and EPA conformity guidelines in citizen suit).

We recognize that there are a number of cases holding that the citizen suit provision, 42 U.S.C. § 7604, only applies to suits against individual polluters or government actors that fail to comply with the specific requirements of a state or EPA implementation plan, and that the provision does not encompass statutory directives requiring the creation of such implementation plans in the first place. *Wilder v. Thomas,* 854 F.2d 605, 613–15 (2d Cir.1988), *cert. denied,* 489 U.S. 1053, 109 S.Ct. 1314, 103 L.Ed.2d 583 (1989); *League to Save Lake Tahoe, Inc. v. Trounday,* 598 F.2d 1164, 1173 (9th Cir.), *cert. denied,* 444 U.S. 943, 100 S.Ct. 299, 62 L.Ed.2d 310 (1979); *Citizens Ass'n of*

---

**5.** Defendants' use of the definition for "emissions standard or limitation" provided in 42 U.S.C. § 7602(k) (a requirement "established by the State or Administrator") is improper because § 7604(f) defines this term for all of § 7604, trumping the definition in § 7602(k).

*Georgetown Committee of 100 v. Washington,* 535 F.2d 1318, 1322 (D.C.Cir.1976); *Natural Resources Defense Council, Inc. v. Train,* 510 F.2d 692, 700 (D.C.Cir.1974); *Council of Commuter Orgs. v. Metro. Transp. Auth.,* 683 F.2d 663, 670–71 (2d Cir.1982). We do not believe, however, that any of these cases have satisfactorily explained why the plain language of § 7604(f)(1) would not apply to suits like the one before us in this case. Instead, these cases seem primarily concerned with declining to allow plaintiffs to use § 7604 as a vehicle to force government agencies or instrumentalities to comply with their general obligations under the Clean Air Act. *See, e.g., League to Save Tahoe,* 598 F.2d at 1168–70, 1173; *see also Coalition Against Columbus Ctr. v. New York,* 967 F.2d 764, 769–71 (2d Cir.1992) (distinguishing between general air quality standards, which are not enforceable under § 7604, and specific emissions controls which are enforceable). Thus, these cases restrict the use of § 7604 to violations of "objective evidentiary standards" and avoid suits requiring a "reanalysis of technological or other considerations at the enforcement stage." *E.g., Wilder,* 854 F.2d at 614.

The present case is distinguishable in that plaintiffs substantive claims involve statutory provisions that are fairly specific and objective. *See* 42 U.S.C. § 7506(c)(3)(A)(iii) (requiring *transportation* plans—which involve exclusively pollution from automobile emissions—to be consistent with § 7511a(b)(1) which requires states to formulate an implementation plan that reduces certain pollutants by 15% from a 1990 baseline level). The provision is more similar to a specific emission control standard applicable to a specific source, than a general air quality standard which may be accomplished in any number of ways depending on the "technological considerations" of the state or agency developing the implementation plan designed to reach the proscribed level of air quality. Thus, even under the aforementioned caselaw, the federal court has jurisdiction over this case.[6]

## 2. The Merits

Under 42 U.S.C. § 7506(c)(1), an instrumentality of the federal government may not authorize, fund or support any activity that does not "conform" to an approved State Implementation Plan ("SIP"). During the relevant period in this case (i.e., an "interim period" when no conforming SIP yet exists), conformity for "transportation plans and programs" in Rhode Island was demonstrated by showing that the plan and program "contribute[d] to annual emissions reductions consistent with § 7511a(b)(1) and § 7512a(a)(7) of this title." 42 U.S.C. § 7506(c)(3)(A)(iii). In this case, the relevant "plan and program" are Rhode Island's Transportation Improvement Program of 1991 ("TIP") and its Transportation Plan of 1992 ("Plan"). The challenged governmental actions include the FHWA's authorization of construction on the Jamestown Connector in July of 1992 and the Corps' issuance of a permit to fill wetlands in May of 1992. The defendants also adopted and approved the TIP and the Plan, actions which the plaintiffs also challenge.

The district court found: (1) that Rhode Island's TIP and Plan conformed with the requirements of the CAA because they contributed to annual emissions reductions consistent with § 7511a(b)(1); and (2) that, regardless, the Jamestown Connector project was not subject to further conformity review pursuant to regulations in effect at the time of approval. 23 C.F.R. § 770.9(d)(3) (w/ drawn Dec. 22, 1992, 57 Fed.Reg. 60,725).

For purposes of the present litigation, which involves construction on the Jamestown Connector, we need not consider the conformity of Rhode Island's TIP and Plan to the extent this issue does not effect the status of the Jamestown Connector project itself. Because the district court's second finding is dispositive in this case, we do not reach the issues raised in the court's first finding.

Plaintiffs claim that the regulation found by the district court to insulate the James-

---

6. Our decision on the jurisdictional issue is a close one. The preliminary evaluation set out above provides ample basis for proceeding to the merits. However, because the outcome of this case does not depend upon our jurisdictional ruling, this Court remains free to revisit the issue in a future case where it may be decisive.

town Connector from further conformity review, 23 C.F.R. § 770.9(d)(3), does nothing to stop the ban on federal support of nonconforming projects provided in § 7506(c) as part of the 1990 CAA Amendments. (Again, the challenged actions include the FHWA's authorization of construction and the Corps' issuance of a permit to fill wetlands in 1992). According to the plaintiffs, the 1990 CAA Amendments either trump the effect of the regulation or simply provide new, independent conformity requirements that must be met before federal action can be taken on any project, regardless of that project's own conformity status. In other words, the Jamestown Connector may itself conform to the CAA, but the TIP and Plan do not, so the government is barred from taking any actions in the entire state, including actions for the Jamestown Connector.

Specifically, plaintiffs read § 7506(c)(3)(B) [7] to mandate that *no* transportation project may receive federal funding or support unless the project comes from a conforming Plan and TIP as defined in 7506(c)(3)(A) or, until November of 1991, from a plan or program found to conform within 3 years prior to November 15, 1990. The issue before us is whether § 7506(c)(3) applies to all projects regardless of their status, or just to projects that have yet to receive a conformity determination as of November, 1990.

■ Without delving into statutory minutiae—and, as a consequence, declining the parties' invitation to engage the battle of dueling legislative histories—we believe that it is certainly reasonable for the district court to (implicitly) interpret the grace period provision in § 7506(c)(3)(B)(i) as applying only prospectively and not to past projects like the Jamestown Connector. First of all,

§ 7506(c)(3)(B) does not say that no project can receive federal support unless it comes from a conforming transportation plan. Instead, the grace period sentence relied on by the plaintiffs, § 7506(c)(3)(B)(i), is part of a provision explaining the manner in which the "conformity" of plans, TIPs and projects will be demonstrated for purposes of the restriction in § 7506(c)(1). Plans whose conformity has already been demonstrated do not appear to fall under the auspices of this provision. The grace period in 7506(c)(3)(B)(i) talks about projects that "come from ... a transportation *program* found to conform within 3 years prior to" November 1991. It says nothing about the project itself being found to conform during the prior 3 years. Consequently, the provision seems specifically aimed at projects whose conformity had yet to be demonstrated by the time the 1990 Amendments took effect.[8] The Jamestown Connector was found to conform in 1988 at the latest (by means of the approval of the Jamestown FSEIS) and we see no indication in § 7506(c)(3) that Congress intended to abrogate this determination.

■ Furthermore, the language of § 7506(c)(3)—"Until such time as the implementation plan revision ... is approved, conformity of such plans, programs and projects will be demonstrated if ..."—sounds like it is referring to the "interim period," that is, the time between the enactment of the Amendments and the adoption of the new SIPs. Thus, a prospective application of the provision seems particularly appropriate and, conversely, a retroactive application particularly inappropriate. This interpretation of § 7506(c)(3) has apparently been adopted by the EPA and the Department of Transportation. *See* June 7, *Environmental Protection Agency and Dept. of Transportation Guid-*

---

**7.** 42 U.S.C. § 7506(c)(3)(B) provides, in relevant part, that conformity of transportation projects will be demonstrated if they:
(i) come from a conforming transportation plan and program as defined in subparagraph (A) or for 12 months after November 15, 1990, from a transportation program found to conform within 3 years prior to such date of enactment.

**8.** For this reason, the plaintiffs' argument that the defendants' interpretation of § 7506(c)(3)(B)(i) would make that provision su-

perfluous is specious. Presumably, there existed plenty of projects in 1990 that were not as far along as the Jamestown Connector and had not yet received a conformity determination, as did Jamestown, prior to the 1990 Amendments. Those projects may have "come from" conforming Plans and TIPs at the time of the Amendments, but the projects themselves had yet to receive a determination of conformity. As a result, the grace period in § 7506(c)(3)(B)(i) was enacted to address these types of projects.

ance for Determining Conformity of Transportation Plans, Programs and Projects With Clean Air Act Implementation Plans During Phase I of the Interim Period, June 7, 1991 at 22–23, 24–25 (interpreting § 7506(c)(3) to apply only to projects that have yet to receive conformity determinations); see also 58 Fed.Reg. 62190–91 (EPA and Department of Transportation regulations holding that its Interim Guidance governs conformity determinations made between 1990 and 1993). It is well established that we afford considerable deference to an agency's interpretation of a statute that it is primarily charged with enforcing, especially a complicated one like the CAA. Puerto Rican Cement Co. v. United States EPA, 889 F.2d 292 (1st Cir.1989) (Courts give EPA's construction of the statute "controlling weight" unless it is "plainly erroneous"); see also Chevron, United States, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844–45, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984); Larson, 2 F.3d at 466–69; Comité Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth., 888 F.2d 180, 186 (1st Cir.1989), cert. denied, 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990).

We realize that a result of this interpretation of the CAA is that states may have conforming transportation projects without having any conforming transportation plans or programs. We see no problem with this outcome as long as federal government support is limited to projects that were basically already on their way to completion before the 1990 CAA Amendments.[9] The plaintiffs' position, however, would result in a more absurd situation—a complete halt of all ongoing projects regardless of how close to completion those projects have become. We see no indication in the CAA that Congress intended such a result.

*Affirmed.*

---

9. Although the FHWA did not authorize construction of the Jamestown Connector until 1992 and the Corps did not issue its permit to fill wetlands until 1992 as well, the final federal environmental go-ahead for the project was given in 1988, and Rhode Island had acquired much of the land for the project by 1990. *See Conservation Law Found.*, 827 F.Supp. at 890.